**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1746-13T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

J.L.G.,

    Defendant-Appellant.

_____

IN THE MATTER OF B.G., M.A.,
and M.G.,

    Minors.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **MAY 17, 2017** |
| **APPELLATE DIVISION** |

Submitted January 20, 2015 — Decided July 21, 2015

Before Judges Simonelli, Guadagno and Leone.
(Judge Guadagno dissenting).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-375-12.

Joseph E. Krakora, Public Defender, attorney for appellant (Evelyn F. Garcia, Designated Counsel, on the brief).

John J. Hoffman, Acting Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Kenneth M. Cabot, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Olivia Belfatto Crisp, Assistant Deputy Public Defender, on the brief).

The opinion of the court was delivered by

SIMONELLI, J.A.D.

In this Title 9 matter, defendant J.L.G. appeals from the finding of the Family Part judge that he abused or neglected a seven-year-old child, M.A. (Mary),[1] within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b) by failing to provide the child with proper supervision by unreasonably allowing the infliction of excessive corporal punishment by her mother, Y.A. (Yvette).[2] For the following reasons, we affirm.

At the fact-finding hearing, plaintiff New Jersey Division of Child Protection and Permanency (Division) relied on the testimony of a Division caseworker, a screening summary, and photographs of injuries Mary sustained as the result of a beating on March 26, 2012.[3] This evidence showed that on March 29, 2012, the Division received a referral from Mary's school

---

[1]  The names used in this opinion are fictitious.

[2]  The judge also determined that Yvette abused or neglected Mary within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b) by unreasonably inflicting excessive corporal punishment. Yvette has not appealed that determination and defendant does not challenge it in this appeal.

[3]  Defendant and Yvette did not testify at the fact-finding hearing or present any documentary evidence.

A-1746-13T2

that the child returned after a two-day absence with a mark and bruise on her right cheek below the eye that was covered by cosmetic make-up. The school also reported that Mary came to school two weeks prior with a bump on her forehead.

On March 30, 2012, the Division caseworker examined Mary and saw a linear scratch and a "greenish/yellowish" bruise on the right side of the child's face. Mary initially said that she hit her face on the bed while running through the house on March 26, 2012, and her mother put cocoa butter on the bruise and kept her home from school so the bruise "could get better." Although defendant, Yvette and Mary's older brother corroborated Mary's initial version of how she sustained the bruise, Mary later said she sustained the bruise when her mother struck her.

In addition to the facial bruise, the caseworker saw bruises with "small red dots" on Mary's left arm that did not appear to have been inflicted by a hand, and bruises on Mary's right arm, which the caseworker described as a "bad" bruise that was "purple in some areas" and "[t]he purple area felt swollen and the skin felt hard." Based on what she saw, the caseworker transported Mary to the hospital, where medical personnel found additional bruises and "red dots" on the child's stomach, which were similar to the dots on her left arm, and bruises on Mary's legs, thighs and back. Mary said that her right arm still "hurt

a little," so X-rays were taken to rule out any fractures. A doctor recommended ice and ointment for the swelling on the right arm and Motrin for pain.

Mary eventually disclosed that her mother hit her on the arms and legs, and also hit her on her stomach with "a big spoon" that "had points." Mary also disclosed that her mother hit her in the past for eating too slowly.

Yvette admitted that on March 26, 2012, she was upset and frustrated that Mary was eating too slowly and hit the child on the arms, legs and thighs with her hand and fist, and on the stomach with a round metal spatula that had holes for draining. The "red dots" seen on Mary's left arm and stomach matched the spatula holes. Yvette disclosed that defendant, her paramour with whom she and the child were living, saw her hitting Mary and "commented to her not to hit [Mary] that she will get in trouble."

Defendant admitted that he was present during the beating and saw Yvette hit Mary with her hand; however, he denied seeing Yvette hit the child with a spatula. He explained that he walked away from the beating because he was holding his infant son and did not want "to expose the baby to that," and he told Yvette "not to get upset or hit [Mary] like that because [Yvette] will have problems." Defendant said it was "not an

everyday thing that [Mary got] hit like that." Nonetheless, he did not report the abuse.

The photographs confirmed that, even three days after the beating, Mary had visible bruises on her cheek, stomach, arms, thighs and back. Several of the bruises still showed the imprint of the perforated metal spatula. Based on the evidence presented, the trial judge found that Yvette had beaten Mary severely with her fist and the metal spatula "very, very hard and certainly more than once." The judge noted that Mary's bruises were evident several days later. The judge concluded that Yvette excessively physically abused Mary; defendant was aware of the abuse and failed to intervene or report it; and defendant understood the gravity of what was happening because he walked away to protect his infant and told Yvette that she could get in trouble. The judge concluded that defendant abused or neglected Mary pursuant to N.J.S.A. 9:6-8.21(c)(4)(b) in failing to provide the child with proper supervision by allowing the infliction of excessive corporal punishment by Yvette.

On appeal, defendant first contends the record lacks sufficient credible evidence that he witnessed Yvette inflict excessive corporal punishment on Mary or that he was aware Yvette hit the child with a spatula. Defendant next contends for the first time on appeal that the judge impermissibly

admitted the caseworker's speculative testimony about what actions he could have taken to prevent the abuse.

We have considered defendant's second contention in light of the record and applicable legal principles and conclude it is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Because defendant elicited the complained-of testimony on the caseworker's cross-examination, it was invited error that he cannot challenge on appeal. See N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340-41 (2010). Accordingly, we focus on defendant's first contention.

To prevail in a Title 9 proceeding, the Division must prove by a preponderance of the competent and material evidence that the defendant abused or neglected the affected child. N.J.S.A. 9:6-8.46(b); N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 32 (2011). The Division need only show that it was more likely than not that the defendant abused or neglected the child. See N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 615 (App. Div. 2010).

Our Supreme Court has established the standard of review in abuse and neglect cases as follows:

> [A]ppellate courts defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses

who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record. Indeed, we recognize that [b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding.

[M.C. III, supra, 201 N.J. at 342-43 (second alteration in original) (citation and internal quotation marks omitted).]

Therefore, "if there is substantial credible evidence in the record to support the trial court's findings, we will not disturb those findings." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). The court may make rational inferences "grounded in a preponderance of probabilities according to common experience" derived from the credible evidence presented. N.S., supra, 412 N.J. Super. at 615. However, "if the trial court's conclusions are 'clearly mistaken or wide of the mark[,]' [we] must intervene to ensure the fairness of the proceeding." L.L., supra, 201 N.J. at 227 (first alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. E.P. 196 N.J. 88, 104 (2008)). We owe no deference to the trial court's legal conclusions, which we review de novo. See, e.g., N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002).

An "abused or neglected child" is defined, in part, as a child under the age of eighteen

whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment[.]

[N.J.S.A. 9:6-8.21(c)(4)(b)].

Defendant does not dispute, nor can he, that he was a "guardian" for Mary within the meaning of N.J.S.A. 9:6-8.21(a) and (c). See also N.J.S.A. 9:6-2 (defining "[t]he person having the care, custody and control of any child" as "any person who has assumed the care of a child, or any person with whom a child is living at the time the offense is committed."). Defendant was much more than Yvette's "boyfriend" or "paramour," as our dissenting colleague describes him. Defendant lived in the home with Yvette and the children, he supported them, Yvette called him her "husband," and Mary and her brother called him their "dad." Defendant, thus, assumed responsibility for Mary's care. N.J.S.A. 9:6-8.21(a).

Under the minimum degree of care standard, "something more than ordinary negligence is required to hold the actor liable[,]" such as "conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of

Human Servs., 157 N.J. 161, 178 (1999). Such conduct "implies that a person has acted with reckless disregard for the safety of others." Id. at 179. A parent or guardian "fail[s] to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." P.W.R., supra, 205 N.J. at 32 (quoting G.S., supra, 157 N.J. at 181). Moreover, a parent or guardian "has the obligation to protect a child from harms that can be inflicted by another parent." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 449 (2012) (citing N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 288-89 (2007)).

The Legislature made no distinction between the duties of a "parent or guardian." N.J.S.A. 9:6-8.21(a), (c). We recognize that parents have a constitutional right to raise their children, but they have no constitutional right to inflict excessive corporal punishment. See F.M., supra, 211 N.J. at 447. Thus, it is neither unconstitutional nor unreasonable for the statute to prohibit a guardian from "unreasonably . . . allowing to be inflicted . . . excessive corporal punishment" by a parent. N.J.S.A. 9:6-8.21(c)(4)(b). Here, it was undisputed that Yvette abused or neglected Mary by inflicting excessive corporal punishment and that Mary was properly removed from her

custody as a result. As Yvette had no right to beat Mary so severely, Yvette's constitutional rights do not absolve defendant of his responsibilities as Mary's guardian to protect her from excessive corporal punishment.

When determining whether a child is abused or neglected, the focus is on the harm to the child and whether that harm should have been prevented had the guardian performed some act to remedy the situation or remove the danger. G.S., supra, 157 N.J. at 182. A guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise a child or recklessly creates a risk of serious injury to that child. Id. at 181.

We find it irrelevant that defendant denied seeing Yvette hit Mary with a spatula, as the evidence was sufficient to support a reasonable inference that he became aware of the growing severity of the beating. Defendant was present when Yvette beat Mary with her hand and did not intercede to stop Yvette. What beating defendant saw was sufficiently severe for him to walk away into the next room to keep his own child from seeing the beating continue and cause him to warn Yvette to stop hitting Mary "like that" because she would get in trouble. Even assuming Yvette had not yet begun beating Mary with her fist and

the metal spatula, it is reasonable to infer that defendant in the next room could still hear those "very, very hard" blows and Mary's reactions. This evidence supported the judge's finding that defendant knew Yvette "was excessively physically abusing" Mary despite his warning to stop.

The evidence also showed that defendant had an opportunity to stop the vicious beating once his warning was ineffective. Because there were at least five or six blows with the fist and metal spatula hard enough to leave bruises and the imprints of the spatula on Mary's body three days later, it is a reasonable inference that the beating continued for a sufficient time for defendant to set down his baby and intervene. Rather than unreasonably allowing Yvette to inflict this excessive corporal punishment, it was also reasonable to infer that defendant could have shielded Mary, separated her from her mother, grabbed the spatula, or restrained Yvette's hands. Defendant presented no evidence that he was physically incapable of doing anything to protect Mary from Yvette. In any event, given that Mary's beating was so severe to cause Yvette to keep her out of school for two days, defendant had ample reason and opportunity to call a doctor, the Division, or the police.

We are satisfied that the record amply supports a finding that defendant abused or neglected Mary within the meaning of

N.J.S.A. 9:6-8.21(c)(4)(b) when he saw Yvette beating Mary, understood the severity of what he witnessed, and did nothing to protect the child or report the abuse. This is not a case where a stepparent occasionally slapped a teenager in the face as a form of discipline with no resulting bruising or marks. See P.W.R., supra, 205 N.J. at 35-36. It is a case where a mother severely beat her seven-year-old child with her hand, fist, and a metal spatula, inflicting significant physical injuries that were evident and painful to the child several days later and required medical intervention. See M.C. III, supra, 201 N.J. at 333-36. The abuse occurred in the presence of a guardian whose lack of intervention contributed to those injuries. Defendant was obligated to protect Mary from the excessive corporal punishment inflicted by her mother, F.M., supra, 211 N.J. at 449, and report the abuse, N.J.S.A. 9:6-8.10. He did neither.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1746-13T2

**GUADAGNO, J.A.D., dissenting.**

This appeal presents the novel issue of whether a boyfriend who tells his girlfriend to stop hitting her daughter can be found complicit in the mother's abuse because he did not do more to stop her. Because I believe defendant exercised the minimum degree of care required by N.J.S.A. 9:6-8.21(c)(4)(b), in telling the mother to stop, and because the proof was insufficient to establish his knowledge that the mother was inflicting excessive corporal punishment, I respectfully dissent from my colleagues' decision to affirm the trial court's finding that defendant abused or neglected his girlfriend's child.

Some additional facts, not mentioned in the majority opinion, inform my decision. The Division was first notified by Mary's school on Thursday, March 29, 2012, that the child had a bruise on her lower eye that was covered with makeup. Caseworker Indhira Reyes went to defendant's home the following day to investigate. Reyes observed the facial bruise and additional bruising on Mary's arms. Mary, her older brother, and her mother, Yvette, initially advised Reyes that the facial bruise was sustained accidentally when Mary fell while running. When Yvette later admitted to inflicting the arm bruises, Reyes contacted the prosecutor's office and her Division supervisor,

Natalie Orbe. Orbe told Reyes to take the child to a hospital to be examined.

When defendant learned that a caseworker was at his home, he immediately returned from work. Reyes asked him about Mary's bruises and defendant told her the incident occurred on Monday, March 26, 2012. He said that Yvette hit Mary with her hand and he did not like it. He was holding his six-month-old son at the time and walked away so as to not expose the infant.

Reyes then took Mary to the hospital where she was examined, and her arm was x-rayed. The x-rays were negative and she was discharged with a recommendation that ice and liniment be applied for any swelling and Motrin taken for any pain.

Reyes next took Mary to the prosecutor's office, where she and Yvette were interviewed by Detective Grace Garces. Yvette advised Detective Garces that defendant had told her to leave Mary alone because she could get in trouble for hitting Mary. Yvette also said that when she hit Mary, she was in the bedroom and defendant was in the living room.

After the interview, Garces informed caseworker Reyes that they would not be arresting Yvette. Reyes relayed this information to Orbe and they agreed to place services in the home and not remove Mary. Reyes then informed Yvette that the

Division considered her discipline of Mary abuse and would be opening a case for services.

Later that evening, Reyes interviewed defendant a second time, pressing him on precisely what he observed and what he said to Yvette. He again stated that he told the mother "not to get upset or hit like that because she will have problems." The caseworker specifically asked defendant if he saw the mother use something to hit Mary. He replied that he did not see Yvette use anything to hit the child.

On Monday, April 2, 2012, one week after the incident and three days after supervisor Orbe had determined that it was not necessary to remove the children, a different Division supervisor, Lillian Valentin, reviewed the case with Reyes and called Garces to inquire why Yvette had not been charged criminally. One hour later, Garces called back and said that a warrant would be issued for Yvette's arrest. Valentin also overruled the decision not to remove the children, and later that day, with their mother in custody, Mary and her ten-year-old brother were removed from the home. Defendant was initially allowed to maintain custody of his infant son.

Later that evening, a different caseworker, Melissa Idrovo, questioned Mary about the bruise on her face and, for the first time, she said that defendant had hit her. After conferring

with Valentin, Idrovo then added defendant's six-month-old son[1] to the removal, and all three children were placed in foster care.

I repeat these facts as they bear on the severity of Mary's injuries and illustrate that the Division initially did not perceive them as serious enough to warrant removal of the child. Although Mary was taken to a hospital as a precaution, she was examined and released ninety minutes later when her x-rays were negative. Mary was discharged with instructions to ice the bruises and take over-the-counter ibuprofen. As such, I disagree with the majority's conclusion that Mary suffered "significant physical injuries that . . . required medical intervention." Ante at ___ (slip op. at l2). But for the second-guessing of a different Division supervisor, it appears that Yvette would not have been charged criminally, the children would certainly not have been removed from the home, and defendant would not have even been named in this litigation.

By the time the fact-finding hearing was conducted on June 20, 2012, the Division had abandoned the allegation that defendant had struck Mary and proceeded strictly on a gross

---

[1] There is no indication in the record that any consideration was given to the fact that Yvette was breastfeeding the infant when he was removed from the home.

negligence, lack-of-supervision theory. As the deputy attorney general stated,

> [T]he case here today is one of physical abuse by the mother and a failure to protect by the father. . . . . [I]t's the Division's theory that [defendant] failed to take appropriate steps to protect the child as he knew this was going on and did not make efforts to stop it.

Before a finding of abuse or neglect can be entered, there must be proof that the defendant was a "parent or guardian." N.J.S.A. 9:6-8.21(a) does not distinguish between parent or guardian, but defines them collectively as "any natural parent, adoptive parent, resource family parent, stepparent, paramour of a parent, or any person, who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care."

Defendant was living with Yvette at the time the offense was committed; he had one child with her, and provided support for her children. Although he may be a considered a guardian of Mary, that designation does not alone define the scope of defendant's duty to protect Mary.

Defendant came to the United States from Mexico twenty-two years ago. He met Yvette in 2010 and began living with her that year. Mary came to this country from El Salvador in May 2011 and had been living with defendant for just nine months when

this incident occurred. The trial judge found that defendant was a "father figure . . . or at least a responsible adult." Neither finding, standing alone, is sufficient to establish defendant's status as Mary's guardian. However, even if defendant assumed responsibility to care for Mary, a guardian does not necessarily carry the same responsibility to care for and protect a child as a biological parent.

The right of a biological parent "to raise one's children" has been deemed an "essential . . . basic civil right[] of man . . . ." Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212, 31 L. Ed. 2d 551, 558 (1972) (internal quotation marks omitted). "[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Id. at 651, 92 S. Ct. at 1212-13, 31 L. Ed. 2d at 558-59 (internal quotation marks omitted). New Jersey has recognized that parents play the primary role in rearing their children. In re D.C., 203 N.J. 545, 568 (2010); Watkins v. Nelson, 163 N.J. 235, 245 (2000); In re Guardianship of K.H.O., 161 N.J. 337, 346-47 (1999).

While the rights and obligations of a parent attach at birth by operation of law, the obligations of a guardian are statutory and therefore subject to a fact-sensitive inquiry. A

person engaged in a long-term relationship who has supported and nurtured a paramour's child for many years will have a different relationship with, and I submit, a different obligation to, a child of a paramour with whom he has recently begun to cohabitate. The majority's "one size fits all" analysis of defendant's status as a guardian ignores this concept.

Defendant's relatively brief, nine-month relationship with Mary was not weighed by the trial judge or considered by the majority. The length and nature of defendant's relationship as Mary's guardian must be evaluated under the "minimum degree of care" standard in determining whether defendant's conduct was willful or wanton and constituted gross negligence. G.S., ante, 157 N.J. at 178. "Conduct is considered willful or wanton if done with the knowledge that injury is likely to, or probably will, result." Ibid. "Essentially, the concept of willful and wanton misconduct implies that a person has acted with reckless disregard for the safety of others." Id. at 179. Whether a caregiver has failed to exercise the minimum degree of care is decided on a case-by-case basis. Id. at 182. Given the limited nature of his relationship with Mary, defendant's attempt to curtail the abuse by telling Yvette to stop or she would get in trouble was reasonable.

More importantly, there was insufficient proof that defendant was aware that Yvette was inflicting excessive corporal punishment.  If Yvette's actions constituted excessive corporal punishment, it was likely because she employed an instrumentality, a spatula,[2] to hit the child.  Compare P.W.R., ante, 205 N.J. at 36 (holding that mother's slap to the face of her teenager as corporal punishment was not excessive and not abuse) with N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 483 (App. Div.) (holding that mother's use of a paddle to discipline five-year-old was excessive corporal punishment and abuse), aff'd on reconsideration, 416 N.J. Super. 414 (2010), certif. denied, 207 N.J. 188 (2011).  Yet the trial judge never determined that defendant saw Yvette hit Mary with a spatula, and defendant's denials that he observed any instrumentality are uncontroverted, even after caseworker Reyes questioned him repeatedly on that issue.  The majority dismisses this failure of proof as "irrelevant" and suggests that we should "infer" that defendant was aware that Yvette was administering excessive corporal punishment from the sounds of the very hard blows.  Ante at __ (slip op. at 10-11).  I disagree.

---

[2] The caseworker and the majority refer to the object as a spatula but photographs actually depict a slotted spoon.

It is not contested that defendant was in another room when Yvette hit Mary, and that he told her to stop. On cross-examination, caseworker Reyes conceded that defendant told her that he only observed Yvette hit Mary with her hand and did not see her with a spatula. The trial judge made no finding, and there is nothing in the record to support the majority's conclusion that defendant was aware that Yvette's corporal punishment was excessive.

The majority agrees with the trial court that defendant could have "physically restrained" Yvette when he heard her hitting Mary. I find no precedential or statutory support for this concept, nor will I speculate whether the majority's suggestion that defendant had an obligation to "set down his baby and intervene" would be made if the genders were reversed and a female defendant holding her six-month-old infant would be required to physically stop her boyfriend from disciplining his biological child. Even assuming that defendant was aware that Yvette was employing excessive corporal punishment, he had only to make reasonable efforts to stop the abuse. G.S., ante, 157 N.J. at 182.

Relying on New Jersey Division of Youth & Family Services v. F.M., 211 N.J. 420 (2012), the majority concludes that defendant was obligated to protect Mary and report the abuse.

Ante at ___ (slip op. at 9). I find F.M. distinguishable. In F.M., the mother allowed her daughter's drug-addicted and mentally ill father, who had assaulted the mother in the past, to have access to the child in express violation of court orders and consent agreements. F.M., ante, 211 N.J. at 428. The court found that the mother was incapable and unwilling to protect her child from the dangerous father. Id. at 451-52. The degree of the abuse in F.M. was not contested, as it is here, and the mother made no effort to protect the child, as defendant did here.

I also disagree with the majority's conclusion that the record does not support defendant's claim that Yvette stopped hitting Mary after he spoke to her. Ante at ___ (slip op. at 11). Licensed clinical social worker Rocio Bottero Day noted in his post-interview report that defendant claimed Yvette stopped hitting Mary after he told her to stop:

> [Defendant] has been charged with negligence because he did not stop [Yvette] when she hit [Mary], however, he disputes this allegation and says that he did tell her to stop hitting the child and that [Yvette] did stop.

Conversely, there is nothing in the record to support the majority's inference that Yvette continued to hit Mary after defendant told her to stop. Without clear proof that Yvette continued to hit Mary after defendant warned her to stop, we are

10

left with defendant's unchallenged statement that his warning was effective in stopping Yvette, and the abuse finding against him cannot stand.

Finally, N.J.S.A. 9:6-8.21(c)(4)(b) prohibits "unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment[.]" (Emphasis supplied). Thus, to be found culpable in the mother's abuse, defendant would have had to allow the excessive corporal punishment. Yet, it is undisputed that defendant did not allow the abuse, but intervened by telling the mother to stop hitting the child.

Absent proof that defendant was aware that Yvette was inflicting excessive corporal punishment upon Mary and that the abuse continued after his warnings, I am not willing to conclude that he "allowed" the abuse within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b). I also believe that defendant's attempt to stop the mother's abuse was reasonable and did not amount to grossly or wantonly negligent conduct.

For these reasons, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11                                                          A-1746-13T2