# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4516-18T1
              A-4517-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

D.P. and A.H.,

      Defendants-Appellants,

and

J.H. and M.E.,

      Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Za.P.,
Zi.P., and Ad.H.,

      Minors.

_____

Submitted May 12, 2020 – Decided June 3, 2020

Before Judges Hoffman, Currier and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0246-18.

Joseph E. Krakora, Public Defender, attorney for appellant D.P. (Robyn A. Veasey, Deputy Public Defender, of counsel; James Daniel O'Kelly, Designated counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant A.H. (Robyn A. Veasey, Deputy Public Defender, of counsel; Patricia Nichols, Assistant Deputy Public Defender, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Louise M. Cho, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendants D.P. (mother) and A.H. (mother's boyfriend) appeal from a June 20, 2018 Family Part order determining that A.H. abused D.P.'s son, Zi.P. (Zebulon)[1], by striking him with a belt and causing serious injuries, within the

---

[1] We refer to the children using pseudonyms for anonymity and ease of reference.

meaning of Title 9, N.J.S.A. 9:6-8.21(c). Zebulon's sister, Za.P. (Zayonara), was also found to be abused by extension. In addition, the judge determined that D.P. knew her children were being physically abused by A.H. and failed to protect them. Having reviewed the record, we conclude that the judge's fact-finding decision was supported by sufficient credible evidence and is consistent with the applicable law. We also conclude that A.H. was not deprived of his right to counsel. Therefore, we affirm.

I.

Zayonara was born in October 2009 and Zebulon was born in July 2011. The children resided with defendants. The family first became involved with the Division of Child Protection and Permanency (Division) on January 6, 2016, when D.P. claimed she had no place to live with her children. The Division placed the family in a YMCA shelter but they left shortly after to live with family and friends.

On January 20, 2017, the Division received a referral that Zebulon complained of D.P. "whooping him." The child had bruises on his leg that appeared to be old. During the Division's investigation, A.H. admitted that he struck Zebulon with a belt after he found him defecating in the kitchen garbage

A-4516-18T1

can, but referred to it as an "isolated incident." The allegations of abuse and neglect were not established, and the Division closed the case on April 9, 2017.

On October 23, 2017, the Division received another referral, this time alleging A.H. physically assaulted D.P. and the children. The reporter indicated that Zayonara had two bruises on her cheek, lost four-and-a-half pounds, only grew one inch, and stated she was "whooped" on several occasions.

During the investigation, Zayonara disclosed that A.H. whipped her with a belt and made her and Zebulon stand in the corner of a room for hours. Zebulon confirmed this. A.H. denied hitting the children, but D.P. admitted that the children were "physically disciplined," and she disagreed with A.H. on how to punish them. The Division concluded the allegations were not established but required defendants to refrain from using corporal punishment.

On December 13, 2017, the Division received a referral from a teacher that Zebulon smelled of urine, wore the same shirt every day, wore clothes that were dirty and moldy, and shoes with holes in them. Zayonara also wore the same clothes every day. A caseworker attempted to interview Zayonara, but the child informed the caseworker she was told not to speak to the Division. The caseworker then interviewed Zebulon, who denied concerns about his home life.

4

After visiting defendants' home, the caseworker reported no concerns and the Division took no action.

On January 2, 2018, the Division received another referral, this time from the school nurse. Zayonara complained of pain in her hand, which appeared red and bruised, and reported to the nurse that A.H. hit her "more times than she could count." The nurse also noted Zebulon had healed marks and bruises on his back.

Division caseworkers investigated the report and observed the physical injuries on both children. Zayonara appeared sad and "fought back tears throughout the interview." She stated that A.H. "popped" her hand the night before when she was playing with her dolls, and again that morning when she put on swimsuit bottoms instead of regular underwear while getting ready for school. The caseworker photographed the injury.

Zayonara informed the caseworker that she had been "popped" like that before by A.H. while D.P. was in the next room with the door open and knew what was going on. D.P. instructed A.H. to stop hitting the children. A.H. made Zayonara sleep on the floor and take cold baths in a sink. She described their basement apartment as a "dungeon." Additionally, Zayonara told the

caseworker that neither she nor Zebulon received a Christmas gift because she spoke to Division caseworkers.

Zayonara also claimed that Zebulon has been hit with a belt, "pluck[ed]" in the head, and "pop[ped]" after urinating in bed or on himself. She reported sleeping in the basement with no hot water or bathroom, using a hole in the ground as a toilet, and often cooking noodles for her dinner.

During Zebulon's interview, he denied any physical abuse or that Zayonara had ever been hit by A.H. However, the caseworker noted that Zebulon was inappropriately dressed for school and the cold weather. Contrary to Zayonara's assertions, Zebulon claimed he had a good Christmas break, used the upstairs toilet, and was fed dinner every day. He also denied that A.H. hit Zayonara. The caseworker observed "a lot of scarring on [Zebulon's] back [and] . . . some on his leg area . . . ."

The caseworker made multiple attempts to contact defendants at their home unsuccessfully. Thereafter, on January 8, 2018, D.P., who was eight months pregnant with Ad.H. (Adam),[2] met with caseworkers at a Division office. Initially, D.P. denied A.H. disciplined the children, and claimed Zayonara's injuries were caused by a fellow student. D.P. called her daughter a "little liar"

---

[2] Adam was born to D.P. and A.H. in February 2018.

and claimed Zebulon's injuries "weren't there before." Later, D.P. admitted A.H. disciplined the children physically with a belt and it could sometimes get "a little aggressive."

Zebulon was interviewed and disclosed that A.H. hit him on his back and legs with a belt, usually after he urinated in his bed. Further, Zebulon admitted that A.H. hit Zayonara on her hands, and he lied about that originally because defendants told him to. According to Zebulon, A.H. makes fun of him for not being able to read. He also corroborated that he ate noodles for dinner almost daily. Zayonara's allegations remained the same.

On the same date, January 8, 2018, the Division conducted a Dodd emergency removal.[3] The children were placed in a resource home. On January 10, 2018, the Division filed a verified complaint for custody of Zayonara and Zebulon in Essex County. That day, the trial court affirmed the removal and ordered that the children remain in the custody, care, and supervision of the Division.

---

[3] "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, . . . N.J.S.A. 9:6-8.21 to -8.82." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011) (citation omitted).

On January 26, 2018, the case was transferred to Hudson County after it was discovered that an Essex County Children in Court employee was related to one of the parents. After Adam was born in February 2018, the Division sought to remove him from defendants' care. On February 20, 2018, the trial court found removal of Adam was appropriate because of the alleged abuse of Zayonara and Zebulon; D.P. having tested positive for cocaine and opiates at Adam's birth; and the suspect conditions at the home.

A fact-finding hearing was held before the Family Part judge on June 20, 2018. The judge heard testimony from the Division caseworker who responded to the January 2018 referral. Defendants did not testify or present any witnesses. No one testified for the Law Guardian.

At the conclusion of the hearing, the judge found defendants abused or neglected Zayonara and Zebulon by a preponderance of the credible evidence. In reaching this decision, the judge determined A.H. hit Zebulon, who was six years old at the time, with a belt, resulting in serious injuries, and that D.P. failed to protect the child despite knowing of A.H.'s infliction of corporal punishment.

In reaching her decision, the judge noted that while the memory of the caseworker "was extremely poor, . . . [and his] knowledge of most of the case was extremely poor," the testimony he gave for the Division "as to his first-hand

observations was honest, he was very honest when he didn't remember something or didn't know the answer." As to the photos of Zebulon's back, the judge stated "[t]he quality of the picture is not good, but it's clear that there are bruises on that back . . . consistent with what . . . would be belt marks and what [Zebulon] said was caused by [A.H.] beating him with a belt."

The judge found:

> What we have here by way of corroboration of both child[ren]'s statements that [A.H.] . . . did on more than one occasion beat [Zebulon] with a belt. We have P-7 in evidence, which is a photo of marks on the back which [the caseworker] testified he saw and was told by [Zebulon] they were caused by [A.H.] beating him on the back.
>
> But more importantly, even without the picture, we have [the caseworker's] physical observation of the marks. There has never been any alternative explanation and there is testimony by [the caseworker] that he asked [D.P.] how those marks could have been caused, and [D.P.] had no explanation.

Based on both children's statements regarding the abuse, the caseworker's credible testimony regarding his observation of Zebulon's injuries, and the photo, the judge was "convinced by a preponderance of the evidence that [A.H.] cause[d] injury to [Zebulon] and that he's at a very serious risk of further serious injury, based on the facts as [the judge] [found] them."

Because the copy of the picture of Zayonara's hand was "so poor that it wasn't possible . . . to see anything" and the caseworker only testified to seeing a scratch when visiting the children's school, the judge could not make findings regarding her injuries. The judge expressed that "the evidence was there, but the Division failed to meet its burden on that allegation." However, the judge found that Zayonara was also at risk of serious injury "by extension . . . because she was present" for Zebulon's abuse. Due to a similar lack of corroboration, the judge was unable to make factual findings regarding the "deplorable and unacceptable" conditions of the home, including the children using a hole in the floor as a toilet or sleeping on a cold floor.

As to D.P., the judge found that the testimony and documentary evidence showed D.P. "knew [A.H.] was beating the children and did nothing about it. Not only did she do nothing, [but] . . . she told the children to lie about it." D.P. admitted that A.H. used physical discipline with the children but "he wasn't going to kill them." Because the judge found, as fact, that D.P. knew A.H. "was being unduly severe with physical punishment" and "failed . . . to report it," the judge concluded that D.P. "neglected to protect [her] child[ren]." Ultimately, the judge found, by a preponderance of the evidence, that both parents abused or neglected the minors according to N.J.S.A. 9:6-8.44 and 8.46(b).

On appeal, defendants challenge the sufficiency of the evidence supporting the judge's finding of abuse and neglect, and argue the judge mistakenly relied on the children's hearsay statements. A.H. argues the photograph of Zebulon's injuries was improvidently admitted into evidence and considered by the judge. A.H. also asserts that he was denied effective counsel in the protective services litigation and that the judge erred in dismissing the action. We disagree and find there is sufficient credible evidence to support the judge's finding and that there was no error in the admission of the challenged evidence.

On May 8, 2019, the judge denied A.H.'s motion for a stay pending appeal of the protective services litigation and terminated the litigation upon the Division's filing of a guardianship complaint. On June 20, 2019, defendants each filed a notice of appeal.[4]

II.

As the reviewing court, we are bound to accept the trial court's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). Although we review legal conclusions by the trial judge de novo, we owe a particular

---

[4] On July 24, 2019, the appeals were consolidated.

deference to fact finding by family court judges because of their special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 413 (1998); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Consequently, we only disturb a family court's findings if they are "so wholly insupportable as to result in a denial of justice." In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). In light of these standards, we find no basis to disturb the trial judge's findings of fact, and those findings support her legal conclusion.

As defined in Title 9, "abuse or neglect" may occur when a child's "physical, mental, or emotional condition has been impaired . . . as the result of" a parent who fails to "exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . ." N.J.S.A. 9:6-8.21(c)(4)(b). A parent may fail to exercise the minimum degree of care if he or she "is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." G.S. v. Dep't of Human Servs., 157 N.J. 161, 181 (1999). The Division must prove its allegations by a

preponderance of the evidence at a fact-finding hearing. N.J.S.A. 9:6-8.46(b)(1).

In these hearings, "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child" of the parent or guardian. N.J.S.A. 9:6-8.46(a)(1). Such evidence may include "any writing, record or photograph . . . made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in [such a] proceeding" of any hospital, public or private institution or agency, if it meets the admissibility requirements similar to those of the business records exception. N.J.S.A. 9:6-8.46(a)(3); see also P.W.R., 205 N.J. at 32.

Likewise, "previous statements made by the child relating to any allegations of abuse or neglect" are admissible, and not considered hearsay, as long as they are not the sole basis for the court's finding of abuse or neglect. N.J.S.A. 9:6-8.46(a)(4). Proof of any injuries sustained by the child that are "of such a nature as would ordinarily not . . . exist except by reason of the acts or omissions of the parent or guardian" is prima facie evidence of abuse or neglect. N.J.S.A. 9:6-8.46(a)(2).

"Excessive corporal punishment" is not defined by statute but is determined on a case-by-case basis. Div. of Youth & Family Servs. v. K.A.,

413 N.J. Super. 504, 511 (App. Div. 2010). In <u>K.A.</u>, we noted "excessive corporal punishment" should be read in light of the term's common usage and understood meaning. <u>Ibid.</u>

While the boundaries of what constitutes "excessive corporal punishment" are undefined in the statute, we have placed particular weight on the statute's inclusion of the word "excessive" and have stated that "[t]he term 'excessive' means going beyond what is proper or reasonable." <u>Id.</u> at 511. Thus, while "moderate correction" may be reasonable, "a single incident of violence against a child may be sufficient to constitute excessive corporal punishment." <u>Id.</u> at 510, 511.

Excessive corporal punishment may occur when "the child suffers a fracture of a limb, or a serious laceration, or any other event where medical intervention proves to be necessary . . . provided that the parent or caregiver could have foreseen, under all of the attendant circumstances, that such harm could result from the punishment inflicted." <u>Id.</u> at 511. The administrative code provides further guidance, listing injuries that may constitute abuse or neglect, including "[c]uts, bruises, abrasions, welts or oral injuries . . . ." N.J.A.C. 10:129-2.2(a)(9).

We conclude A.H.'s arguments concerning the exhibits admitted into evidence are without merit. First, A.H. challenges the admission of the Division's screening and investigation summaries without redacting hearsay statements.

N.J.S.A. 9:6-8.46(a) declares admissible as prima facie evidence of its contents

> any writing, record of photograph . . . made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, if the judge finds that it was made in the regular course of the business of any hospital or any other public or private institution or agency . . . .

While the statute does not define "in the regular course of business," its meaning should be "interpreted as identical to the meaning of that phrase in the business-records exception to the hearsay rule." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 346 (2008) (citing N.J. Div. of Youth & Family Servs. v. E.D., 233 N.J. Super. 401, 413-14 (App. Div. 1989)); N.J.R.E. 803(c)(6). Additionally, corroborated statements by the child in an abuse and neglect case may be admissible, even if they would otherwise be considered hearsay. N.J.S.A. 9:6-8.46(a)(4) ("[P]revious statements made by the child

15

relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse and neglect.").

Additionally, Rule 5:12-4(d) permits reports prepared by the Division's staff to be submitted into evidence. N.J. Div. of Youth & Family Servs. v. B.M., 413 N.J. Super. 118, 131 (App. Div. 2010). These reports are "treated as prima facie evidence, subject to rebuttal." R. 5:12-4(d). As they are "prepared by the qualified personnel of a state agency charged with the responsibility for overseeing the welfare of children . . . [the reports] supply a reasonably high degree of reliability . . . ." In re Guardianship of Cope, 106 N.J. Super. 336, 344 (App. Div. 1969). Division reports must be "prepared from [the author's] own first-hand knowledge of the case," with any conclusion supported by "a statement of the facts or procedures upon which it is based." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 90-91 (App. Div. 2008) (alteration in original) (quoting Cope, 106 N.J. Super. at 343-44).

Although A.H. challenges the admission of the screening and investigative summaries, the record shows the judge only relied upon the children's statements, the photograph of Zebulon's injuries, and the caseworker's

testimony.  Moreover, the summaries were properly admitted under Rule 5:12-4(d).  See Cope, 106 N.J. Super. at 344.

We also reject A.H.'s argument that the judge erred by relying on the caseworker's testimony to corroborate the children's statements.  One of the "most effective types of corroborative evidence may be eyewitness testimony . . . ."  N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003)).  Because it is rare that "evidence could be produced that would directly corroborate the specific allegation of abuse[,]" the corroborative evidence of the children's disclosures need not be "direct" or even "offender-specific."  N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018).  "Rather, corroborative evidence 'need only provide support' for the child's statements and may be circumstantial."  Ibid. (quoting N.B., 452 N.J. Super. at 521).

The caseworker testified that he became involved with the family in January 2018.  During the investigation, the caseworker observed and photographed the injuries to Zayonara's hand.  Zayonara then reported that she and Zebulon had been hit before, and Zebulon was hit with a belt.  The caseworker and the school nurse photographed the scarring on Zebulon's back

and legs. Later on, Zebulon disclosed the abuse, consistent with Zayonara's account.

Although the judge found the caseworker's memory "extremely poor," she also noted his testimony "was honest" and deemed him "very credible." The caseworker provided eyewitness testimony of the injuries consistent with the abuse described by the children. We defer to the judge's findings and discern no error.

A.H. also argues the judge erroneously admitted a photocopy of the photograph of Zebulon's injuries into evidence. Again, we reject A.H.'s argument.

Rule 1002 requires that "[t]o prove the content of a writing or photograph, the original writing or photograph is required" unless otherwise provided by evidence rules or statute. A duplicate of an original "is admissible to the same extent as an original unless (a) a genuine question is raised as to the authenticity of the original, or (b) in the circumstances it would be unfair to admit the duplicate in lieu of the original." N.J.R.E. 1003. Trial courts are awarded sound discretion in evidential rulings. State v. Brown, 170 N.J. 138, 147 (2001).

The judge aptly found:

> There is a picture in evidence P-7 which [the caseworker] authenticated is a picture of what he

> testified is [Zebulon's] back and it shows multiple dark bruises. The quality of the picture is not good, but it's clear that there are bruises on that back that [the caseworker] testified were consistent with what he believed would be belt marks and what [Zebulon] said was caused by [Andy] beating him with a belt.

A.H. cites K.A. to argue his behavior did not constitute excessive corporal punishment. In K.A., the mother hit her daughter with a closed fist four or five times in her shoulder, leaving bruises. 413 N.J. Super. at 506. The mother's lapse of judgment lasted four or five seconds, and she "accepted full responsibility for her actions." Id. at 506, 512. We also cited the "aberrational" nature of the incident, and the Division's failure to remove the child from the mother's care, in support of our decision to reverse the finding of substantiated abuse. Id. at 513.

In this case, A.H. hit Zebulon repeatedly, leaving marks and scars on his back. The judge found "it's really crucial in this case to realize that [the] child was six years old, six years old. . . . [T]he child . . . was beaten repeatedly with the belt . . . ." Clearly, the facts of this case do not warrant reversal of the judge's decision on the same grounds as K.A.

A.H. also challenges the judge's finding as to Zayonara. Here, the judge determined that the injury to Zayonara's hand did not constitute abuse or neglect,

19

but she was at substantial risk of harm based on the findings of abuse against Zebulon.

N.J.S.A. 9:6-8.46(a)(1) provides that "the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child" of that parent or guardian. This section does not, however, "mean that harm to one child is conclusive proof of harm to another child." N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454, 475 (App. Div. 2017).

Here, the judge found that Zebulon was abused or neglected under the statute, and by inference, Zayonara was similarly harmed. The judge's finding is not contrary to the statute and is in line with the holding in K.A. We discern no reason to disturb it.

For the first time on appeal, A.H. argues that he was denied effective assistance of counsel in the Title 9 litigation because he had no attorney present and lacked the ability to prepare a defense before the commencement of the guardianship proceeding. He claims it was insufficient to merely have counsel present at the fact-finding hearing and not have representation earlier on in the proceedings.

Because A.H. did not raise this argument or contest his counsel's competence during the trial court proceedings, we need not consider it. State v.

Vincenty, 237 N.J. 122, 135-36 (2019).  However, we recognize the salient nature of the argument and address it.

A parent has the right to counsel in a termination of parental rights case. N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 306 (2007) ("[T]he right to counsel in a termination case has constitutional as well as statutory bases.").  The need for competent counsel is evident "in light of the nature of the right involved; the permanency of the threatened loss; the State's interest in exercising its parens patriae jurisdiction only where necessary; and the potential for error in a proceeding in which the interests of an indigent parent, unskilled in the law, are pitted against the resources of the State."  Ibid.  Because the right is guaranteed, "the performance of that counsel must be effective."  Id. at 306-07 (citations omitted).

A.H. was properly served with the initial protective services complaint and chose not to appear at the January 2018 hearing.  The Division made multiple attempts to serve him with an amended complaint to no avail, resulting in A.H. missing the February 2018 hearing.  However, A.H. completed a 5A application for assignment of counsel through the Office of the Public Defender, which the Division processed for him, because of his non-responsiveness.  Prior to the fact-finding hearing, A.H. was assigned counsel, who provided competent

21

services. A.H.'s lack of representation at the prior hearings was due to his own failure to appear. Therefore, A.H.'s argument is devoid of merit.

D.P. contends the judge erred by finding she was aware of A.H.'s severe physical punishment of Zebulon and failed to protect him or report the abuse. As to Zayonara, D.P. claims the judge misapplied N.J.S.A. 9:6-8.46(a)(1) to conclude that because Zebulon was abused and neglected, she was also.

Any person who has "reasonable cause to believe that an act of child abuse has been committed" must report that abuse immediately to the Division. N.J.S.A. 9:6-8.14(a). Parents specifically have an obligation to protect their children from harm, including harms that are inflicted by another parent. F.M., 211 N.J. at 449. "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." G.S., 157 N.J. at 179 (citations omitted). This includes situations where one parent is aware that the other has inflicted excessive corporal punishment on a child and fails to remedy the situation. N.J. Div. of Child Prot. & Permanency v. J.L.G., 450 N.J. Super. 113, 116 (App. Div. 2015).

We note that D.P. visited the Division's office on January 8, 2018, and originally denied that A.H. physically disciplined her children, calling them "little liars." The judge called her remark

> stunning and appalling, because that is not something we want to hear from [a] mother, which basically is -- yeah, but [the abuse] was okay, because [A.H.] didn't kill them and he didn't intend to kill them.
>
> . . . .
>
> [D.P.], by her own admission . . . knew [A.H.] was beating the children and did nothing about it. Not only did she do nothing, it appears she told the children to lie about it.

Similarly, in J.L.G., we found it "irrelevant" that the defendant denied seeing his wife hit her child with a spatula because he knew his wife beat the child with her hand and was aware of the "severity of the beating." J.L.G., 450 N.J. Super. at 121-22. Despite the lack of evidence that the defendant witnessed his wife using her fist or spatula to discipline the child, we allowed a "reasonable inference" in finding that the defendant knew his wife "was excessively physically abusing" the child "despite his warning to stop." Ibid.

Based on D.P.'s statements and the record, we find no support for her claim that her actions did not constitute abuse and neglect under the statute. See G.S., 157 N.J. at 182. D.P. was aware of the abuse, understood the severity of

23

it, and took no action to protect her children. See J.L.G., 450 N.J. Super. at 122. The judge properly concluded it was "more likely than not" that D.P., through her indifference, abused and neglected her child.

Finally, we address A.H.'s assertion that the judge erred in terminating the Title 9 action because a guardianship complaint was filed.

N.J.S.A. 30:4C-15 confers "sole authority" upon the Division to determine whether a guardianship complaint should be filed or not. N.J. Div. of Youth & Family Servs. v. A.P., 408 N.J. Super. 252, 264-265 (App. Div. 2009). Indeed, the Division is required to file a petition for termination of parental rights "no later than when the child has been in placement for [fifteen] of the most recent [twenty-two] months" unless an exception is established. Id. at 265. Therefore, contrary to A.H.'s assertions, the Division was not only free to file a guardianship complaint at this point, but obligated to, given the fifteen-month length of time the children were in the Division's custody.

Additionally, there is no requirement that the court conduct or conclude a fact-finding hearing before the filing of a guardianship complaint. N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 556 (1994); A.P., 408 N.J. Super. at 265. Instead, because the actions are of a separate and distinct nature, they "may proceed independently of each other." K.M., 136 N.J. at 558. If the

24                                                                          A-4516-18T1

Division is prevented from bringing a termination proceeding until an abuse or neglect action concludes, "the Legislature's goal of achieving permanency in the placement of children will be frustrated and the child will suffer." Id. at 559. We find no error in the way the judge addressed this issue.

We conclude the record contains substantial, credible evidence supporting the judge's finding of abuse and neglect as to both defendants and discern no reason to disturb it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4516-18T1