# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4068-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.M.,

      Defendant-Appellant,

and

J.F. and S.A.,

      Defendants.

_____

IN THE MATTER OF N.F.
and S.M., minors.

_____

Submitted September 14, 2020 – Decided September 18, 2020

Before Judges Sabatino and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FN-09-0222-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Kevin G. Byrnes, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant J.M.[1], the mother of N.F., appeals the Family Part's fact-finding determination that she neglected N.F., in violation of N.J.S.A. 9:6-8:21(c), by failing to protect N.F. from repetitive sexual contact over a two-year period, by a male boarder who lived in their home.

Defendant's primary argument is that the trial judge improperly relied on hearsay statements presented by the Division of Child Protection and Permanency ("the Division"). For the reasons that follow, we affirm.

---

[1] We use initials in this opinion to protect the minors' privacy. R. 1:38-3(d)(11) and (12).

I.

Factual Background

The Division's proofs at the fact-finding hearing may be summarized as follows. Defendant is the biological mother of two daughters: N.F. ("Nancy") who was born in March 2007; and N.F.'s older sister S.M. ("Sharon"), who was born in March 2002.[2] Nancy's biological father, J.F., is separated from defendant but he lives on the first floor of the same building where defendant and the two daughters reside. The biological father of Sharon, S.A., is also separated from defendant but he resides elsewhere. Neither father is a party to this appeal. At the times relevant to this case, the upstairs unit was occupied by defendant, her two daughters, a maternal uncle, J.M., and a boarder, P.N.

According to the Division's proofs, starting in 2015, Nancy reported to defendant that P.N. had been touching her inappropriately. Nevertheless, P.N. continued residing as a boarder in defendant's residence.

About two years later, in July 2017, Nancy again told defendant that P.N. had touched her in ways that made her feel uncomfortable. Nancy also told

---

[2] We use the same fictitious first names for the daughters as are used in the Division's brief.

defendant that P.N. had showed her nude photos.  Defendant instructed Nancy to avoid P.N., but she took no other action.

In January 2018, the Division received a referral from Nancy's school, reporting that a man renting a room in her unit had been touching her breasts and vagina.  According to the report, Nancy had informed defendant of these sexual contacts, but defendant simply told her to stay away from him.

<u>Investigation by the Division and the County Prosecutor</u>

The Division then conducted an investigation into these allegations.  A case worker interviewed Nancy, who detailed the repeated incidents of sexual contact by P.N.  According to Nancy, P.N. would inappropriately touch her when he was alone with her, such as when defendant was out running errands with her sister.  As described by Nancy, P.N. would touch her breasts or vagina.  She also recounted an incident when she was home alone with P.N. when he came out of the shower and exposed his penis to her, causing Nancy to run into her bedroom.

As described by Nancy, P.N. began touching her and engaging in other inappropriate acts when he first moved into the house about two-and-a-half years earlier, when Nancy was eight years old.  She explained to both the Division's case worker and an investigator from the county prosecutor's office

A-4068-18T3

that when she reported P.N.'s conduct to defendant, defendant simply told her to avoid P.N. and promised to speak with him about it.

When interviewed by the prosecutor's investigator about these allegations, defendant admitted that Nancy had told her P.N. had touched her, but initially claimed that Nancy was pointing to her shoulders as the place where he had done so.  Later on, defendant admitted that Nancy had told her that P.N. had touched her breasts and vagina over her clothing.  Defendant also admitted that Nancy had told her that P.N. had shown her videos of naked women.

According to defendant, she did ask P.N. about these allegations, but he denied them.  She described P.N. as a "trustworthy man," and refused to believe Nancy's contentions until she had more proof of the abuse.

Following this investigation, P.N. was arrested and charged with sexual assault of a minor and other offenses.  Defendant and Nancy's father, J.F., were also arrested, and charged with endangering the welfare of a child.[3]  The Division conducted an emergency removal of Nancy and her sister from the home and initially placed them in the care of a maternal cousin.

---

[3] Apparently, those criminal charges against defendant and J.F. were dropped.

The Present Title Nine Case

The Division filed the present abuse-or-neglect case against defendant and J.F. under Title Nine. At the ensuing two-day fact-finding hearing in May 2018 the Division presented two witnesses: the case worker, Mauricio Diaz, and an expert psychologist, Dr. Anthony D'Urso.

Diaz recounted to the judge the steps he had undertaken to investigate the allegations and to safeguard the children's safety. Dr. D'Urso then testified that he had reviewed the case documents and the detective's videotaped interview of Nancy, and concluded that the acts of sexual abuse were "clinically supported."

In addition to the two testifying witnesses, the Division presented the investigation reports and other documents, including a psychological evaluation of Nancy.

Defendant chose not to testify at the hearing, and she did not present any witnesses on her own behalf.

The Judge's Decision

After considering the evidence, Judge Lois Lipton issued an oral opinion on July 16, 2018. In her decision, the judge notably found the testimony of both Diaz and Dr. D'Urso to be credible. By contrast, the judge found defendant's version of "what she was told and what she wasn't told" to be lacking in

A-4068-18T3

credibility. In particular, the judge noted that "[i]t does not make sense" if defendant thought that Nancy was touched only on the shoulder, that she would tell P.N. that she would "kick him out," if the alleged touching were true.

The judge then applied the governing law under Title Nine. She concluded that defendant's failure to report Nancy's allegations of repeated sexual abuse by P.N. to the police or the Division constituted "grossly and wantonly negligent" conduct, which resulted in "harm to the child and serious risk of future harm."

Among other things, the judge found that Nancy's statements had been corroborated in part by the clinical assessment of Dr. D'Urso and also by the evaluation performed by the other expert who had interviewed Nancy. The judge also pointed to defendant's own admission that Nancy had reported P.N.'s improper conduct to her. The judge disbelieved defendant's contention that Nancy had only said that P.N. touched Nancy on the shoulder, as being inconsistent with her alleged instruction to Nancy to try to get proof of P.N.'s conduct on her cell phone.

Having canvassed these proofs, Judge Lipton concluded the Division had met its burden of proving abuse or neglect as to the defendant by a preponderance of the evidence. By contrast, the judge found the Division had

7

not similarly proven abuse or neglect by J.F. The judge noted that Nancy had consistently told the Division's case worker, prosecutor's office, and the clinical evaluators that she had not told her father "at any time" about being inappropriately touched. In addition, the judge found no other evidence that J.F. had been advised by defendant, nor by anyone else, about improper sexual conduct. Instead, J.F.'s information was "filtered through" defendant, "who wanted P.N. to remain in the home."[4]

The Appeal

On appeal, defendant argues: (1) the trial court erred in basing its findings of neglect "solely on the child's uncorroborated out-of-court hearsay declarations," and (2) the court erred in admitting opinion testimony of a clinical psychologist, Dr. D'Urso, "on the issue of whether there had been child sex abuse."

The Law Guardian joins with the Division in opposing these points on appeal, and in arguing that we affirm the trial court's decision.

---

[4] The Division does not appeal this determination of no abuse or neglect as to J.F.

A-4068-18T3

## II.

The pertinent legal standards under Title Nine we apply here are well established. An abused or neglected child under Title Nine is one whose

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court; . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

The Supreme Court established that the phrase "minimum degree of care" under the statute "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). A parent or guardian falls short of the "minimum degree of care" standard "when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017) (quoting G.S., 157 N.J. at 181).

Our scope of review of the Family Part judge's fact-finding determination of abuse or neglect is limited. We must defer to the factual findings of the

Family Part if they are sustained by "adequate, substantial, and credible evidence" in the record. N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (citation omitted). That deference is justified because of the Family Part's "special jurisdiction and expertise in family matters." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (citation omitted). The reviewing court grants particular deference to the trial court's credibility determinations, N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007), and only overturns its determinations regarding the underlying facts and their implications when the "findings went so wide of the mark that a mistake must have been made." Ibid. (internal quotation omitted). That said, an appellate court does not give special deference to the trial court's interpretation of the law, which it reviews de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

Applying these well-settled principles here, we affirm the Family Part's determination that defendant was grossly negligent in failing to protect her daughter from the repeated sexual abuse by her boarder, P.N. We do so substantially for the reasons articulated in Judge Lipton's bench opinion. We amplify our conclusion with a few additional comments.

A-4068-18T3

First, we are satisfied the trial court did not misapply evidentiary principles in its fact finding or unfairly rely on hearsay statements. Title Nine contains a special exception to the hearsay doctrine, N.J.S.A. 9:6-8.46(a)(4). That exception prescribes that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." Ibid.

Although the most effective corroborative evidence may be eyewitness testimony or a confession, the "corroborative evidence 'need only provide support for the out-of-court statements.'" N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003) (quoting N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)). There must be some evidence in addition to the child's statement itself, and such evidence may be circumstantial. N.J. Div. of Youth & Family Servs. v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017).

In Z.P.R., we noted that, in cases of sexual abuse such as the present matter,

> [t]he child victim is often the only eyewitness to the crime, and physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism,

11

> fondling . . . . Consequently, in order to give any real
> effect to the child victim hearsay statute, the
> corroboration requirement must reasonably be held to
> include indirect evidence of abuse.
>
> [351 N.J. Super. at 436 (internal citation omitted).]

To be sure, in N.B., 452 N.J. Super. at 522, we observed that "courts must protect against conflating a statement's reliability with corroboration." Moreover, "consistency alone does not constitute corroboration." Id. at 523.

Here, there are essentially two distinct issues that bear upon defendant's culpability for neglect: (1) whether P.N. sexually abused Nancy and (2) whether defendant was sufficiently aware of the abuse and nevertheless failed to take action. As to the first question, defendant does not challenge the sufficiency of the corroboration of Nancy's statements regarding sexual abuse by P.N. Indeed, the record supports the court's finding that the Division provided sufficient corroboration as to the occurrence of the sexual wrongdoing. The Division determined that Nancy's statements were confirmed -- not just by their consistency over time, but by the sensory details that she described, her emotional responses to the abuse, and her lack of exaggeration.

The second pivotal question relates to the proof of defendant's awareness of her daughter's victimization. The trial court reasonably found such awareness had been proven by the Division. The judge's decision was not, as defendant

12

argues on appeal, "solely" based on the child's hearsay statements. In fact, defendant's awareness was established not only by Nancy's multiple and consistent assertions that she had reported the sexual abuse to others, but also by defendant's own admissions and behavior.

Although defendant initially claimed that Nancy had told her that P.N. had merely touched her on the shoulder, defendant subsequently admitted to Detective Luz-Mary Jimenez that Nancy told her P.N. had touched her on her breasts and vagina. Defendant further admitted that Nancy had told her P.N.'s touching made her feel uncomfortable. Defendant also admitted that, on a second occasion, Nancy disclosed to her that P.N. had touched her on her buttocks. Defendant further admitted, in response to Detective Jimenez's questioning about pornographic videos, that Nancy had alleged that P.N. "showed her videos of girls and boys."

Defendant further acknowledged that Nancy's older sister Sharon told her that P.N. kissed her or "did something like that to her." In addition, defendant admitted to Diaz that she had "failed her daughters," and was "fully aware that she made a big mistake" in not taking appropriate action to stop P.N.

In addition to these admissions by defendant, Nancy's allegations are also consistent with the assertions by her older sister, Sharon, that she herself had at

A-4068-18T3

least conversations with their mother asking her to "do something" about P.N.'s abuse. Sharon also stated that when she was in the fourth grade, P.N. licked her cheek, although she did not report that particular incident.

As the trial judge pointed out, defendant's own conduct in failing to react responsibly to Nancy's allegations is also indicative of an awareness that more had occurred than merely P.N. touching Nancy's shoulder. For example, defendant's suggestion to Nancy that she try to take a cell phone video or photo of P.N.'s behavior belies her claim that the conduct was benign. Moreover, defendant's assurances that she would address the matter with P.N. directly (or indirectly with the assistance of Nancy's father) is also indicative that she believed Nancy's allegations were not imaginary or insignificant.

In sum, there was ample proof of corroboration here to enable the trial court to admit Nancy's out-of-court assertions into evidence and also to find them sufficiently credible to rely upon them.

Turning to defendant's second legal argument, we discern no harmful error stemming from the court's consideration of Dr. D'Urso's expert testimony. The expert, who notably was unrebutted by a competing defense expert, provided a useful conceptual and clinical framework to help the court in assessing Nancy's

allegations, and the severity of the harm that resulted from defendant's failure to take protective action.

Dr. D'Urso's fleeting mention of the term "accommodation" during his testimony and its inclusion in a related report was a far cry from a full-blown expert presentation of Child Sexual Abuse Accommodation Syndrome ("CSAAS"), a theory which the Supreme Court has since deemed unreliable. See State v. J.L.G., 234 N.J. 265, 272 (2018).

Dr. D'Urso did not make or present a CSAAS diagnosis in this case. In fact, Nancy was never diagnosed by anyone with CSAAS, and instead was found to have adjustment disorder with anxiety. The dangers of misuse or prejudice of CSAAS concepts in this context before an experienced Family Part judge are unlike those existing in a jury trial. Indeed, the judge did not even mention CSAAS in her decision.

We are mindful of our admonition in N.B., 452 N.J. Super. at 523, that mental health professionals should not "opine about the trustworthiness of a child's hearsay statements." We recognize in this regard the trial court did consider, to some extent, Dr. D'Urso's expert views about Nancy's credibility, based upon her clinical presentation. Nonetheless, even if those references are

ignored, there remains ample evidence in the record to support the trial court's findings of defendant's gross negligence as a parent.

As a final point, we must acknowledge that the prime wrongdoer in this matter is, of course, P.N., assuming the alleged sexual misconduct did occur. The record does not inform us of exactly what happened with the criminal charges against P.N., and we need not know them for purposes of adjudicating this civil appeal. It is worth noting that defendant does not claim that she was threatened by P.N. to ignore her daughter's allegations or physically coerced or intimidated by him.

Because of her fiduciary responsibilities as a parent, defendant was obligated to take some action to try to protect her daughter, even if she was not herself the perpetrator. Indeed, it is well established that a parent fails to exercise a minimum degree of care when she is aware of the dangers inherent in a situation and fails to protect her child from harms that are being inflicted by another member of the household. See, e.g., N.J. Div. of Prot. & Permanency v. J.L.G., 450 N.J. Super. 113, 121 (App. Div. 2015), aff'd o.b., 229 N.J. 113 (2017).

A-4068-18T3

To the extent we have not otherwise addressed them, all other arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4068-18T3