# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1145-20

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANCY,

     Plaintiff-Respondent,

v.

T.S.,

     Defendant-Appellant,

and

D.T.,

     Defendant.

_____

IN THE MATTER OF A.T.,
a minor.

_____

Submitted September 29, 2021 – Decided February 2, 2022

Before Judges Fuentes, Gilson, and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0314-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Victor E. Ramos, Assistant Deputy Public Defender, Designated Counsel, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Wesley Hanna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In this Title Nine case, defendant T.S. (Tina),[1] who is the mother of A.T. (Ava), appeals from two orders. First, she appeals from a June 29, 2018 order, finding she and D.T. (Dean), Ava's father, had abused or neglected Ava, who by the time she was two-months old had sustained fractures to her wrist, ankle, femur, and ribs, by not providing a minimum degree of care to her while under their care. Second, she appeals from a November 13, 2020 order ending the case because a complaint for termination of parental rights had been filed. Dean has

---

[1] We use initials and fictitious names for ease of reading and to protect the identities of the parties. R. 1:38-3(d)(12).

not appealed. Ava's law guardian and the Division of Child Protection and Permanency (Division) urge us to affirm the orders. Finding no merit to defendant's arguments, we affirm.

I.

We begin by summarizing the facts and procedural history relevant to this appeal.

The Division became involved with Tina in 2015, when defendants' first child died at seven weeks while in bed with Tina. The cause of death was determined to be sudden infant death syndrome. The Division did not find any wrongdoing by defendants.

Ava was born on November 28, 2017. A hospital social worker reported her birth to the Division because it was hospital policy to contact the Division if a family had a prior case with the Division. When the Division learned defendants did not have a crib for Ava and planned to have her sleep in Dean's bed while Dean and Tina slept on the floor, the Division provided a crib and counseled defendants on safe sleeping arrangements for an infant. Defendants and Ava lived with Dean's parents and his younger brother. Defendants were Ava's primary caretakers and equally shared parenting responsibilities.

A-1145-20

At around 4:30 p.m. on January 28, 2018, while Tina was outside talking with a friend, Dean was attempting to change Ava's diaper. Ava was kicking her legs and wiggling, Dean held her feet tightly, and he felt a "pop" and heard a popping sound, "like cracking knuckles," when he picked Ava up. Ava began to "scream in a high pitch scream," loud enough for Tina to hear her outside even though the windows were closed. Because Ava could move her leg, defendants assumed it was not broken. Even though Ava would retract her legs and cry when touched, they did not initially seek treatment for her.

That night at about 9:30 p.m., Dean went to the laundromat with his parents. Sometime around 11:30 p.m., Tina sent Dean a text stating Ava did not want to move her leg. When Dean returned home after finishing the laundry with his parents, Tina repeated that Ava did not want to move her leg and told him Ava's foot was swollen and Ava would cry when her foot was touched. They then brought Ava to a hospital emergency room. According to hospital records, Ava was admitted at 2:01 a.m. on January 29, 2018.

The emergency room physician ordered x-rays of Ava's femur, tibia, fibula, and pelvis. The x-rays did not reveal any fractures. Ava was diagnosed with a minor leg injury, given Tylenol, and discharged. Defendants were told to follow up with their pediatrician in two days.

4

Three days later, on February 1, 2018, defendants brought Ava to her pediatrician for her first routine well visit. Tina had not sought additional treatment for Ava before then, even though she had observed increased swelling in Ava's leg, spreading up to her thigh. They saw the pediatrician at about 10:00 a.m. Preparing to administer vaccines, the doctor noticed swelling and hardening in the tissue of Ava's right thigh, refused to vaccinate her, and told defendants to take her to the emergency room. Instead of taking her right to the emergency room, defendants returned home. According to Tina, they did not bring her to the emergency room until 9:00 or 10:00 p.m. that evening. Hospital records show a check-in time of 12:54 a.m. on February 2, 2018. Tina stated they had waited to bring Ava to the emergency room because Dean had a job interview at 4:00 p.m. and his father did not return with the car until later in the evening.

This time, hospital personnel were told defendants had heard a pop when Ava hit her leg on the side of the crib. A new x-ray revealed a spiral fracture to her right femur. The prior x-ray failed to reveal the fracture because a diaper blocked the view of the bone. Because of the type of fracture in a child Ava's age, the consulting orthopedist was concerned her injury was caused by "non-

5

accidental trauma." He thus recommended a full skeletal survey, and hospital staff reported the injury to the Division.

The Division began an investigation and reported Ava's fracture to the local police and county prosecutor. The Division interviewed defendants on February 2, 2018, and again three days later. Defendants provided similar accounts of what had occurred, repeating Dean's story about the January 28 "popping" incident. Visiting their home, the Division investigator found the crib the Division had provided for Ava in the family's basement, purportedly taken down because Dean at one point blamed it for Ava's fractured femur.

Ava's skeletal scans revealed several additional fractures: a healed fractured wrist, an ankle with a healing "buckle fracture," and three broken ribs. The doctor who reviewed the scan results concluded the fractures "likely occurred at different times, given their varied stages of healing," and were caused by more than just a single blow. The doctor believed the femoral spiral fracture would most likely have been caused by a twisting motion and the posterior rib fractures were likely due to a squeezing of Ava's chest. According to the skeletal scans and subsequent genetic testing, Ava had normal bone density and did not have osteogenesis imperfecta, commonly referred to as

brittle bone disease or other genetic mutations that would account for the multiple fractures.

Concluding its investigation, the Division substantiated both defendants of physical abuse based on the fractures. On February 15, 2018, the Division filed a verified complaint and order to show cause for custody of Ava. Finding that being in defendants' care put Ava "at substantial risk of harm" and was "unsafe due to her unexplained injuries," the trial court granted the Division custody. On the same day, Ava was discharged from the hospital and placed with her maternal grandmother.

On March 28, 2018, defendants provided voluntary statements to the East Orange Police. Dean recounted the events leading up to the initial emergency room visit, stated the "popping" event happened after 4:22 p.m., and described Ava's cry as seeming "like agony." Dean admitted to the police it was possible he had caused Ava's ankle fracture by trying to get her to stand up, an activity his mother had told him to stop. Dean agreed the rib injuries could have occurred when he held Ava upright, with his hands wrapped around her torso. Dean also acknowledged he may have caused the wrist fracture by using Ava to play a "game" in which he would punch someone with Ava's fist, holding her wrist and pretending to box or swing in a fighting motion. He admitted he may

have been playing a little rough with Ava and that he may have been responsible for Ava's injuries by "shadow boxing (punching) with her wrist and bouncing her up and down on his lap while she was a month old."

In her statement, Tina also described the cry she had heard on January 28, 2018, as being loud enough for her to hear from outside with the windows closed. When asked if that incident was the first time she had ever heard Ava cry in that manner, Tina admitted she heard the baby cry like that "a lot of times." The detective also asked Tina if she thought Dean was ever too rough with the baby. She responded, "maybe playing . . . cause when he plays with her . . . he makes her punch stuff." When asked how long Dean had been "playing" with Ava by making her "punch stuff," Tina stated:

> When she turned a month, that's when he started doing it. Because before, I didn't want him to do that, because, just in case, I didn't want him to when she was only weeks [old]. I was, if you want to play with her, that's fine, but I want to wait until she turns a month.

Tina insisted she trusted Dean with Ava and stated she made sure he was not "rough" with her because she watched him "play" with her. However, she also stated she had left Ava alone with Dean often, especially since he had been laid off in mid-January. When asked why she had no concern about Dean's punching game, Tina responded with silence.

A-1145-20

The detective also asked Tina about the delay in taking Ava to the emergency room when instructed to do so by the pediatrician. Tina initially stated to the detective she and Dean had waited until Dean's father returned home with a car. She later conceded the delay also was caused by Dean's 4:00 job interview, which he was able to attend by bus. Tina felt no urgency about taking Ava to the emergency room as instructed by the pediatrician, even though she was aware of the worsening condition of Ava's leg and even though the pediatrician had refused to vaccinate Ava because of the condition of her leg. When confronted with the fact she could have taken Ava to the emergency room and Dean still could have made the interview, Tina again responded with silence.

During a two-day fact-finding hearing, the Division presented testimony from a Division investigator, one of the police detectives who had interviewed defendants, and Dr. Debra Steinbaum, an expert in pediatrics and child-abuse pediatrics. The Division also submitted numerous exhibits into evidence. Defendants did not present any witnesses.

Dr. Steinbaum testified a spiral fracture of the femur is an incredibly rare injury in a non-ambulatory child, especially a two-month-old infant who cannot propel herself. Dr. Steinbaum opined the fracture likely was caused by a twisting force or two opposing forces on the long bone. The injury would have

to have been caused by significant trauma. Dr. Steinbaum explained a buckle fracture comes from compressive force, such as Ava's leg having been "slammed" down and was not something Ava could have done to herself. Ava's wrist fracture likely had healed over time. Although Dr. Steinbaum could not date the wrist fracture precisely, she testified healing does not typically appear until ten to fourteen days after the injury. As for the rib fractures, Dr. Steinbaum testified fractured ribs in a non-ambulatory infant are "almost unique to abuse" and would be caused by squeezing, with the ribs, which are not easy to break, bending until they break. Dr. Steinbaum confirmed Ava's genetic tests revealed no mutation related to bone issues and her bone density was normal. She rejected defendants' explanation that the spiral fracture had been caused by Dean picking Ava up and holding her legs to change a diaper. As for Dean's explanation of the wrist and ankle injuries occurring as the result of his punching "game," Dr. Steinbaum testified that had someone been "playing" with Ava in that manner and caused Ava to hit something with her hand with enough force to produce a fracture, Ava would have cried out in pain and the "play" would have been abusive.

In a decision placed on the record, the Family Part found credible the Division's witnesses and recited the facts established by their testimony and the

other admitted evidence. The court's factual findings included: Ava had had a spiral fracture of her femur, a bucket-handle fracture of her ankle, a possible fracture of her wrist; and multiple posterior rib fractures; Ava's fractures were at various stages of healing; the fractures "could not have occurred without significant trauma"; the fractures would have caused Ava pain, discomfort, and swelling; Ava would likely cry or be irritable when the injuries were new; after the "popping" incident, Tina could hear Ava crying even though she was outside and the windows were closed; Tina had heard that type of crying from Ava before; Dean had acknowledged he could have caused Ava's fractures, including by his punching "game"; and Tina did not have concerns about leaving Ava alone with Dean even though she was aware he "play[ed] a little rough" with her.

The Family Part found the Division had proven a prima facie case of abuse or neglect under N.J.S.A. 9:6-8.46(a)(2) by establishing Ava had sustained injuries of such a nature as would not have ordinarily been sustained except by virtue of defendants' acts or omissions. The Family Part also held "the Division continue[d] to bear the burden of persuasion" as to defendants' culpability and had met that burden. As to Dean, the Family Part found by a preponderance of the evidence Dean's handling of Ava on January 28, 2018, resulted in the femur

fracture and was grossly negligent. The Family Part concluded, "this may not have been the first time that [Dean] handled the child in a way that led to really serious injury," and he "was not using a minimum degree of care that's required." As to Tina, the Family Part made clear it was guided by the principles that "a parent or guardian also has an obligation to protect the child from harms that can be inflicted by another parent," citing New Jersey Division of Youth & Family Services v. F.M., 211 N.J. 420, 449 (2012), and New Jersey Division of Child Protection & Permanency v. J.L.G., 450 N.J. Super. 113 (App. Div. 2015). Given that Tina had acknowledged "she had seen too rough play" by Dean and the multiple fractures at different stages of healing over time, the Family Part found "it is more likely than not that the mother knew that there was rough treatment happening" and that Tina had "failed to provide a minimum degree of care by permitting the contact to continue." The Family Part concluded "both of the defendants . . . either abused or neglected [Ava] by causing or allowing her to sustain multiple fractures that would not have occurred but for some type of abuse or neglect at least at the level of . . . gross negligent handling."

The Family Part issued a written order, citing N.J.S.A. 9:6-8.21(c) and stating

> The court finds that [Ava] was in the care and custody
> of her parents when she sustained a series of fractures

that were in various stages of healing. [Ava] was found to have a fractured wrist, ankle, femur and three fractured ribs. The court finds that parents did not provide [Ava] a minimum degree of care. And for all of the reasons stated on the record, the court finds that the allegations against [defendants] are substantiated by a preponderance of the evidence.

Tina presents the following related issues on appeal:

I. THE TRIAL COURT ERRED IN ITS EVALUATION OF THE LAW IN J.L.G. AND MISAPPLIED THE FACTS OF THE CASE IN DETERMINING THAT TINA KNEW OF DEAN'S RECKLESS TREATMENT OF [AVA] AND WAS LIABLE FOR THE INJURIES SHE HAD EXPERIENCED UNDER HIS CARE.

II. THE TRIAL COURT'S CONCLUSION THAT TINA FAILED TO PROVIDE [AVA] A MINIMUM DEGREE OF CARE RESULTING IN THE SEVERAL BONE FRACTURES IDENTIFIED IS ERRONEOUS AS A MATTER OF LAW IN A CASE ANALYSIS UNDER N.J.S.A. 9:6-8.21(c)(1).

III. THE TRIAL COURT ERRED IN ITS APPLICATION OF THE UNDERLYING FACTS OF THE CASE TO CONLUDE THAT TINA FAILED TO PROVIDE [AVA] A MINIMUM DEGREE OF CARE WHERE TINA SAID THE INTERACTION DEAN HAD WITH [AVA] IN HER PRESENCE WAS NOT ROUGH AND WHERE THE COURT IMPUTED KNOWLEDGE TO TINA OF DEAN'S OTHER ADMITTED CONDUCT WITH [AVA] THAT TINA NEITHER ACKNOWLEDGED OR MADE MENTION OF.

13

IV. THE TRIAL COURT'S IMPUTATION TO TINA OF KNOWLEDGE ABOUT THE OTHER TYPES OF INTERACTION WHICH DEAN SUBSEQUENTLY ACKNOWLEDGED WAS ERRONEOUS AND RESULTED IN APPLICATION OF AN IMPERMISSIBLE CATEGORICAL RULE RATHER THAN THE REQUIRED ANALYSIS OF PARTICULARIZED EVIDENCE.

II.

Our review of family-court decisions is "strictly limited." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div.2010). "[W]e apply a deferential standard in reviewing the family court's findings of fact because of its superior position to judge the credibility of witnesses and weigh the evidence," N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021), and "because it possesses special expertise in matters related to the family," F.M., 211 N.J. at 448. Thus, we are bound to accept the trial court's factual findings as long as they are supported by sufficient credible evidence. N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 155 (App. Div. 2018); see also N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007) (holding a trial court's findings are entitled to deference "unless it is determined that they went so wide of the mark that the judge was clearly mistaken"). We owe no deference to a judge's legal conclusions. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). A finding that

14

a party was negligent is a legal conclusion and, therefore, is not entitled to any deference.  Dep't Child. & Fams., Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 308 (2011).

A.

As our Supreme Court recently summarized in J.R.-R., 248 N.J. at 368:

> New Jersey's child-welfare laws balance "two competing interests:  a parent's constitutionally protected right 'to raise a child and maintain a relationship with that child, without undue interference by the [S]tate,' and 'the State's parens patriae responsibility to protect the welfare of children.'"  [N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs.] v. A.L., 213 N.J. 1, 18 (2013) (citations omitted).  Title Nine "outlines the standards for abuse and neglect proceedings against parents and guardians."  Ibid.  The clear purpose of Title Nine is to protect children "who have had serious injury inflicted upon them" and to ensure that they "are immediately safeguarded from further injury and possible death."  N.J.S.A. 9:6-8.8(a); see also A.L., 213 N.J. at 18.  To that end, Title Nine provides for the civil prosecution of a parent or guardian who abuses or neglects a child.  N.J.S.A. 9:6-8.33.

"The prevailing concern in abuse and neglect cases is the best interests of the child."  N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 146 (App. Div. 2016); see also N.J.S.A. 9:6-8.8(a) (under Title Nine, children's safety is "of paramount concern and the best interests of the child shall be a primary consideration").  "Abuse and neglect cases are generally fact sensitive"

15

and require "careful, individual scrutiny." <u>N.J. Div. of Youth & Fam. Servs. v. P.W.R.</u>, 205 N.J. 17, 33 (2011). "An analysis of a parent's conduct must account for the surrounding circumstances." <u>Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O.</u>, 223 N.J. 166, 180 (2015).

An abused or neglected child is one:

> whose parent or guardian . . . (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; . . . (4) or . . . whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . ; or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [N.J.S.A. 9:6-8.21(c)(1), (2), and (4).]

See also J.R.-R., 248 N.J. at 369. The Division has the burden of proving by a preponderance of the evidence a parent abused or neglected a child. J.R.-R., 248 N.J. at 359.

"Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 181-82 (1999). "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182; see also S.G., 448 N.J. Super. at 144. "[A] parent's action or inaction can constitute abuse or neglect." J.R.-R., 248 N.J. at 370. "A parent who fails 'to exercise a minimum degree of care' by unreasonably allowing harm to be inflicted on a child is accountable under the statute." Ibid. (quoting N.J.S.A. 9:6-8.21(c)(4)). "A parent cannot stand by mutely as a child is abused; the parent has a duty to intercede on the child's behalf." Ibid.

A court must determine "the parent's level of culpability." T.B., 207 N.J. at 307.

> [W]here a parent or guardian acts in a grossly negligent
> or reckless manner, that deviation from the standard of
> care may support an inference that the child is subject
> to future danger. To the contrary, where a parent is

17

> merely negligent there is no warrant to infer that the child will be at future risk.
>
> [Ibid.]

"That assessment must consist of a particularized review of a parent's or caretaker's actions and the impact of any act or omission on the child." E.D.-O, 223 N.J. at 180. In determining whether a parent's conduct amounted to gross negligence, courts consider whether "'an ordinary reasonable person' would understand the perilous situation in which the child was placed." N.J. Div. of Youth & Fam. Servs. v. A.R., 419 N.J. Super. 538, 546 (App. Div. 2011); see also T.B., 207 N.J. at 308.

## B.

Tina does not dispute Ava was abused or that Dean's reckless treatment of Ava caused the multiple fractures. She argues the Division did not prove by a preponderance of the evidence her culpability. Because the Family Part's finding was supported by adequate, credible, and substantial evidence, we affirm.

Arguing the Family Part lacked sufficient evidence to find her culpable, Tina focuses on one piece of evidence – her concession that she had seen Dean engage in rough "play" with Ava – and reframes it as "mild misbehavior" and "some questionable playful interactions which she immediately addressed."

18

Rough "play" with a two-month-old infant is not the equivalent of "mild misbehavior" or "questionable playful interactions." Dean acknowledged to police detectives his rough "play" was capable of causing Ava's multiple fractures. And Tina did not "immediately address[]" it. Instead, as she stated to police detectives, after she had seen Dean engaging in rough "play" when Ava was only weeks old, she told him to wait until Ava was a month old: "I didn't want him to [do this] when she was only weeks [old]. I was, if you want to play with her, that's fine, but I want to wait until she turns a month." With that statement, she effectively gave Dean permission to engage in rough "play" with their infant daughter after one month of life. How could "rough play" she knew to be wrong for a three-week old somehow be safe and appropriate for a four-week old? An ordinary person would understand the perilous situation in which Tina was placing her infant daughter when she left her alone with Dean. See A.R., 419 N.J. Super. at 546.

Moreover, the Family Part had before it more evidence than that statement. Tina admitted she previously had heard Ava make the type of cry she made after the "popping" incident on January 28, 2018, which Tina could hear even though she was outside and the windows were closed. Ava had sustained multiple fractures over time caused by significant trauma. Those

19

fractures would have caused Ava significant pain, discomfort, and swelling, and Ava likely would have cried or been irritable when the injuries were new. Tina did not have concerns about leaving her two-month-old daughter alone with Dean, even though she was aware he "play[ed]" too rough with her and even though she repeatedly had heard Ava cry out in pain as she had on the evening of January 28. This record shows the Division presented adequate, credible, and substantial evidence to support an inference that, as a result of Tina's actions and inaction, Ava was subject to future danger. See T.B., 207 N.J. at 307. In this light, we discern no legal or factual basis to question the validity of the Family Part's finding as to Tina's culpability.

Tina faults the trial court for citing J.L.G., 450 N.J. Super. 113. Although, as the trial court recognized, J.L.G. is factually distinct in some respects from this case, J.L.G. stands for the principles that in a Title Nine case, "the focus is on the harm to the child and whether that harm should have been prevented had the guardian performed some act to remedy the situation or remove the danger" and a "guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise a child or recklessly creates a risk of serious injury to that child." J.L.G., 450 N.J. Super. at 121. Here, the severe harm inflicted on Ava would have been

20

prevented had Tina stopped Dean from engaging in rough "play" with Ava by not leaving her alone in his care, instead of simply telling him to "wait until she turns a month."

Tina faults the trial court for relying on the minimum-degree-of-care language of subsection (c)(4)(b) of N.J.S.A. 9:6-8.21, arguing the applicable language is found in subsection (c)(1) of the statute. In making that argument, she concedes she witnessed Dean engage in his punching "game" with Ava on multiple "occasions" and asserts, with no citation to the record, she had made undescribed "efforts to rein in [his] behavior." Under the standard for subsections (c)(4)(b), (c)(1), or (c)(2), which was also cited by the trial court, the evidence presented, including that Tina told Dean to "wait until she turns a month" and allowed her two-month-old daughter to be in Dean's unsupervised care when she knew he engaged in rough "play" with her, having witnessed on multiple "occasions" his punching "game," supports the conclusions that the Division met its burden of proof and Tina was culpable.

Tina contends that she witnessed a "mild[er]" version of the punching "game" than that described by Dean. The Family Part was free to accept Dean's description and demonstration of how he conducted the "game." The Family Part also was acting within its discretion when it accepted or rejected whatever

portions of Tina's unsworn statement to police it deemed appropriate. Under our standard of review and with sufficient credible evidence in the record, we see no basis to overturn the trial court's factual determinations, including its determination Tina "knew there was rough treatment happening." And, contrary to Tina's assertions, the trial court based its legal conclusions on those specific factual determinations, not on any improper imputations or impermissible categorical rule.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1145-20